# The Colom Law Firm, L.L.C.

200 SIXTH STREET NORTH, SUITE 102
COLUMBUS, MS 39701

WILBUR O. COLOM
W. EASON MITCHELL*†
B. KELLY HARDWICK
SHIRLEY C. BYERS
CHARLES T. BRANT**†
MONIQUE B. MONTGOMERY
CHARLIE R. WAITS, III*
AMBER D. WALDEN**

ADMITTED IN
ALABAMA*
GEORGIA**
DISTRICT OF COLUMBIA†

MAILING ADDRESS:
POST OFFICE BOX 866
COLUMBUS, MS 39703-0866
TELEPHONE: (662) 327-0903
FACSIMILE: (662) 329-4832
WEBSITE: www.colom.com

POST OFFICE BOX 55787
JACKSON, MS 39296
TELEPHONE: (601) 974-6075
FACSIMILE: (601) 974-6076

170 MITCHELL STREET, S.W.
ATLANTA, GA 30303
TELEPHONE: (404) 522-5900
FACSIMILE: (404) 526-8855

October 19, 2005

John Berghoff, Jr., Esq.                          Fax No. 312-701-7711
Counsel for PACTIV/TMA
Mayer, Brown, Rowe & Maw LLP
71 South Wacker Drive
Chicago, IL 600606

Bernard Taylor, Esq.                              Fax No.  404-881-7777
Counsel for Louisiana Pacific Corporation
Alston & Bird
1201 W Peachtree St.
Atlanta, GA 30309-3424

Re:   Clients of The Colom Law Firm and Environmental Litigation Group
      versus PACTIV/TMA and Louisiana Pacific Corporation

Dear Messrs. Berghoff and Taylor:

On behalf of all the clients who have been listed on our settlement/tolling agreement we make a claim for damages for property damage, personal injury, bodily injury, disease, sickness and death and extend a request for settlement of those claims.  The following summary of our clients' claims and causes of action is not set out in any particular order of importance.  This letter should be considered both in its entirety and as a collection of separate statements.  Our clients were damaged by material

John Berghoff, Jr., Esq.
Bernard Taylor, Esq.
October 19, 2005
Page 2

which came to them through water, soil, product and air. The damages and acts or omissions which caused them first began to occur in the early 1960's and continued to accumulate on a regular basis, becoming much worse when both of your clients assumed ownership and operation of the facility.

We have attached a list of 1091 of our deceased and diseased clients. We represent 21 people with Leukemia or related blood disorders which are recognized to be caused by this type of chemical exposure. We represent 121 children, or incapacitated adults, with catastrophic birth defects which are recognized to be caused by this type of chemical exposure. We represent 198 people with cancer or who are survivors of cancer recognized to be caused by this type of chemical exposure. We represent hundreds of people with diseases, injuries and conditions which may potentially be fatal, but which normally just make a person miserable and chronically sick. We also represent hundreds of people who have suffered property damage.

Many of our clients are deceased or about to die. Alabama has a unique wrongful death statute which provides that the recoverable damages for unlawful homicide resulting from even simple negligence are entirely punitive. Alabama does not allow compensatory damages for death, because life is priceless and not limited to mathematical calculations. An Alabama jury would be informed by the trial court that "damages in this type of action are entirely punitive, imposed for the preservation of human life and as a deterrent to others to prevent similar wrongs." If a jury found that the conduct, acts or omissions of your clients probably caused the death of one of our clients, they would be required and allowed to send a message to your clients and all other companies that negligently handle toxic or carcinogenic chemicals. We consider a public complaint against your clients for homicide to be a serious matter which we have investigated thoroughly. Our clients' claims for wrongful death are based upon all of the

John Berghoff, Jr., Esq.
Bernard Taylor, Esq.
October 19, 2005
Page 3

acts or omissions set out in the subsequent sections of this letter, matters which could be established after discovery in a civil lawsuit and the additional facts discovered from your clients' former managers and employees in videotaped interviews.  For example:

A.    Louisiana Pacific Corporation and PACTIV/TMA sold scrap wood, including "cut off" pieces of treated wood products to the community for use as firewood.  This firewood was defective and dangerous to burn in home fireplaces because it contained toxic chemicals which are now recognized by the Environmental Protection Agency as carcinogenic.  The toxic smoke emitted from homes which used firewood purchased from your clients' facility caused damages to the families which used it in an intended manner and to their surrounding neighbors.

B.    The facility night watchman admitted that part of his job was to use a garden hose connected to the city water supply to dilute monitoring wells.  There was even an employee whose job was to come to work early to make sure that the night watchman had not forgotten to remove the evidence of wrongful nighttime activities.

C.    Employees disconnected omission control devices at night so that equipment would work at higher capacity.

D.    Employees secretly pumped toxic chemicals into the creek which is adjacent to the facility so that open lagoons would not appear to be near full capacity.

John Berghoff, Jr., Esq.
Bernard Taylor, Esq.
October 19, 2005
Page 4

E.   Toxic chemicals containing high concentrations of dioxins were illegally burned on site rather than being disposed of at toxic waste landfills or proper incinerators.

F.   Waste wood and pond sludge containing dioxin/furan contaminated pentaclorophenol (PCP) was burned for years in the facility boiler.

G.   The companies used a spray nozzle located in the boiler smoke stack above the opacity meter to spray dioxin laced toxic waste water into the escaping smoke.

H.   Employees and local management were pressured to "do whatever it takes" in order to allow this facility to out produce its capacity and to increase the companies' reported profits. The purchase and use of control devises was not consistent with this plan.

I.   Contrary to company reports to EPA, no wastes were ever transported to an approved disposal facility.   These companies used the "less expensive alternative" which was to burn the toxic waste or discharge it into a nearby creek.   Company documents confirmed what witnesses told us.

J.   Most of the former employees and managers who worked in the treatment facility are now dead at an early age.

K.   Clean up crews disposed of waste by burning it.

L.   The facility sold "cut off" pieces and broken wood as firewood.

John Berghoff, Jr., Esq.
Bernard Taylor, Esq.
October 19, 2005
Page 5
_____

The actions of the employees and these companies many not have been intended to cause damage, from their standpoint at the time, but development in analytical technology and science for determining damage caused by exposure to these chemicals supports the conclusion that those employees who have come forward with this information have good reason to feel guilt and anger.

     As a direct, indirect or consequential result of your clients' day-to-day operations at the Lockhart/Florala Wood Treatment Facility our clients have suffered personal injury, bodily injury, diseases, illnesses and death resulting from contamination of their property and the neighborhood in which they live. Documents obtained from the United States Environmental Protection Agency and the Alabama Department of Environmental Management verify that your clients carelessly used chemicals which are known or likely human carcinogens in their everyday operation. Our clients' claims are based upon negligence, wantonness and recklessness, trespass, negligent trespass, products liability and other causes of action allowed under the laws of the State of Alabama. The cumulative effect which occurred over years of operation of the wood treatment facility at Lockhart and Florala, combined to cause catastrophic injuries and damages to many of our clients and damage to their property. Pentaclorophenol contaminated with dioxin and furan, creosote constituents, polynuclear aromatic hydrocarbons and elemental heavy metals such as arsenic and chromium were allowed to come in contact with the air, groundwater and soil. The toxic effects of these chemicals are universally recognized. These are chemicals which are now known to cause cancer, birth defects, developmental defects, dread diseases, pulmonary disorders, cognitive dysfunction and other terminal or life altering diseases from their genotoxic mutagenic, teratogenic and immunotoxic effects.

John Berghoff, Jr., Esq.
Bernard Taylor, Esq.
October 19, 2005
Page 6
_____

Both plant employees and residents corroborate the story of constant and extreme poor air quality resulting from a persistent toxic cloud over many years.  Drippage, spills, air contamination, leaks in the processing area, the treated wood storage area, the tank areas, the preservative storage loading and unloading areas, and seepage and air contamination from lagoons, sludge disposal, open burning, spray fields, teepee burners and boiler discharge coupled with contamination spilled from tanks and trucks accumulated over a period of time to cause the injuries and damages listed in the attached list of our clients who are suffering from disease and birth defects or who are dead.  We feel that any jury which has an opportunity to observed deformed and incapacitated children, and to observe the effects of death and disease in the Florala/Lockhart community, will award substantial sums, compensation, damages and expenses.

Most of our clients live or lived in close proximity to the treatment facility.  Our clients and their children attended school only a few hundred yards away.  For almost ten years, your clients operated a spray field which contained a large number of spray nozzles in order to spray their dioxin contaminated waste water into the air resulting in an undetected toxic cloud over this entire community.  The Florala/Lockhart community is small and is relatively geographically isolated.  Your clients' former wood treatment facility is the only industrial source of the chemicals which could have caused this damage.  Even without benefit of exhaustive discovery in a lawsuit, we have obtained public documents which both support and verify the results of investigation, including:

A.    Inspection Notes by ADEM's Fermon Lindsey, dated April 10, 1979, indicate that three wood waste boilers and one teepee burner are in operation at the TMA Forest Products site in

John Berghoff, Jr., Esq.
Bernard Taylor, Esq.
October 19, 2005
Page 7

_____

Lockhart.  The boilers as well as the teepee burner are reported to have emission problems.

B.   A letter dated February 22, 1980, by Weston Engineering to William Stengle, TMA, recommends large pumps and to increase (spray field) nozzles to 70.  "Sludge generated ... would be categorized as hazardous ... subject to strict disposal criteria ..."

C.   April 16, 1981, Vice-President of TMA, J.R. Cook, represents that ultimate disposal at an approved hazardous waste site is planned for the 75,000 pounds of estimated hazardous waste annually.

D.   Department of Public Health memo.  On April 17, 1981, Ed Hughes of AWIC called to report waste problem at TMA, Lockhart.  A large inventory of wood chips (ready for burning) saturated with creosote and pentachlorophenol was observed.

E.   On December 27, 1982, Bernard Cox, Chief, Hazardous Waste Branch, Alabama Department of Environmental Management (ADEM) sent a Notice of Deficiency letter to Mr. McGinley of the Tennessee Pulp and Paper Company, owners/operators of the TMA Forest Products facility in Lockhart.  Environmental regulation violations were listed.

F.   1982 report of TMA to EPA indicates that 12,201 pounds of bottom sediment toxic sludge was disposed of on-site. (By burning, see G below)

John Berghoff, Jr., Esq.
Bernard Taylor, Esq.
October 19, 2005
Page 8

G.    October 24, 1983, F.B. McGinley, Environmental Central Supervisor for Tennessee River Pulp and Paper Company (TMA) writes that cost estimate of closure of pond is based on the more expensive option of disposal of the toxic waste at Emil Chemical Waste Management hazardous waste landfill and states that:

> "It is felt that this option will not be necessary however, and a less expensive alternative would be mixing of sludge from this system with sawdust and burning it in the wastewater boiler."

H.    January 21, 1984, LP presents closure plan to ADEM. "5. Sludge materials will be removed and hauled by truck to Chemical Waste Management, Inc., Emil, Alabama." "This final closure action is considered to be sufficient to remove all possible traces of hazardous contamination.   For this reason, no further groundwater monitoring is contemplated ..." (It was ultimately burned on site and allowed to contaminate the entire area.)

I.    February 16, 1984, EPA reports contamination detected in groundwater and burning of hazardous waste observed.  Boiler blow-down had been discharged on East bank of creek.

J.    April 17, 1984, EPA Douglas McCurry gives LP notice of violations.

K.    On April 25, 1984, ADEM sent a Notice of Deficiency to LP, Lockhart, based on findings from a Compliance Inspection conducted on February 16, 1984, by ADEM's Joe Brewer.  Among

John Berghoff, Jr., Esq.
Bernard Taylor, Esq.
October 19, 2005
Page 9

other things the burning of Waste PCP and Creosote in the facility boilers was noted.

L. June 11, 1984, LP letter to TMA stating that it is imperative to receive all data and information on pond and well logs. "Purported groundwater contamination had occurred prior to Louisiana Pacific takeover ..."

M. On June 18, 1984, ADEM received a letter dated June 15, 1984, from Roy Ezell, Plant Manager, Lockh art facility, LP, that indicated that burning of Pentachlorophenol (PCP) waste in the facility boilers had ceased as of March 15, 1984, and all PCP had been shipped off-site. (Roy Ezell now admits that treated waste wood continued to be burned on site.)

N. LP report of June 18, 1984, to EPA indicates that 2,000 pounds of hazardous waste was disposed of on-site. Second report indicates that 10,168 pounds of hazardous waste from pond sediment was disposed of on-site. (By burning)

O. Memorandum dated June 27, 1984, from Fermon Lindsey to Ron Gore both of ADEM, regarding observed activities at the Louisiana Pacific - Lockhart Sawmill. Facility had discontinued use of Pentachlorophenol (PCP) and presently only used creosote and copper Chromium-Arsenate (CCA) in their wood treating processes. Sawdust was used to capture Creosote from leaks in retorts and run-off in the drain. The facility wanted to burn it in the boilers.

John Berghoff, Jr., Esq.
Bernard Taylor, Esq.
October 19, 2005
Page 10

P.    August 15, 1984, L.P. (Former TMA activity) was cited by EPA for sludge (PCP and Creosote) in impoundments, an uncontrolled creosote disposal pit, groundwater contamination and PCP (dioxin laden) waste being burned illegally.

Q.    September 18, 1984, Environmental Protection Systems (EPS) reports indicate that TMA started use of penta (PCP) in 1978. From 1965 to 1968, TMA disposed of creosote wastewater in a pit near Highway 55. Penta waste wood was burned in boilers until March 14, 1984.

R.    RCR # 3012 Site Inspection Report, October 18, 1984, history provided wood treating activities begin in 1962 and continued until 1968 when the treating operations were moved to the southwest corner of the site. Creosote wastewaters and boiler blowdown were discharged into Pond Creek, confirmed by both inspection and testing.

S.    October 18, 1984, letter from LP to ADEM, explains training explains training was not documented because all training was only on-the-job.

T.    October, 1984, LP modifies plan submitted to regulators and provides for disposal of any hazardous waste at approved hazardous waste landfill. (Instead, it was burned on site.)

U.    December 12, 1984, ADEM inspection report, creosote waste is skimmed, caught in sawdust filler and burned in the boiler.

John Berghoff, Jr., Esq.
Bernard Taylor, Esq.
October 19, 2005
Page 11

V.    In a letter dated February 27, 1985, Bernard Cox of ADEM listed additional compliance deficiencies noted in Louisiana Pacific's response letter dated December 4, 1984.

W.    A Memorandum, dated February 28, 1985, from Margaret Markey to Bernard Cox both of ADEM, indicates a meeting with LP representatives. Subjects discussed were the disposal methods for PCP contaminated wastewater accumulated in the facility's surface impoundments. Thermal destruction (burning of the wastewater in the wood-fired boilers) was ruled out and Louisiana Pacific was warned not to inject toxic wastewater into the boiler.

X.    April 25, 1985, ADEM notice to LP of deficiencies and of finding of groundwater contamination by pentachlorophenol.

Y.    July 1, 1985, ADEM Daniel Cooper writes "EPA data indicates that contamination of the groundwater beneath the site does exist ... contrary to the opinion held by Louisiana Pacific ... the fact that the facility does not indicate the presence of contamination is evidence of a serious problem with Louisiana Pacific's sampling and/or analytical process."

Z.    On July 2, 1985, EPA Region IV, Thomas Devine sent a Notice of Violation to LP's Waldyn Benbenek following a May 23, 1985, Compliance Inspection at it's Lockhart facility conducted by Alan Farmer. Drums containing toxic wastes were not labeled (to prevent burning) and personnel training records for CCA treatment were incomplete.

John Berghoff, Jr., Esq.
Bernard Taylor, Esq.
October 19, 2005
Page 12

AA.  In a letter dated July 17, 1985, addressed to itself and furnished to ADEM August 29, 1985, by Enviro-Trek, Inc., LP contends that "the so called problem at the Lockhart facility has been grossly overstated."

BB.  On August 14, 1985, ADEMs Dan Cooper sent a Notice of Violation to LP's Waldyn Benbenek, following a review of the Lockhart facility.

CC.  On September 9, 1985, ADEM's Bernard Cox sent a Notice of Deficiency to LP's Waldyn Benbenek following a review of the Lockhart facility's closure.

DD.  In a letter dated April 8, 1986, Louisiana Pacific settled the pending EPA action and agreed to install additional groundwater monitoring wells, conduct closure properly at pond #2, remove toxic waste water, test sediment, and dispose of sediment according to applicable regulations and to pay a civil penalty of $20,000. (Employees now tell us that the toxic waste was either burned or buried in shallow trenches on site.)

EE.  On July 21, 1986, ADEM's Bernard Cox sent a Notice of Violation to LP's Roy Ezell following a review of the Lockhart facility's Groundwater Quality Assessment Plan.

FF.  On September 5, 1986, ADEM's Bernard Cox sent a Warning Letter to LP's Roy Ezell following a compliance inspection conducted by B. Turk on July 30, 1986.

John Berghoff, Jr., Esq.
Bernard Taylor, Esq.
October 19, 2005
Page 13

GG.  Company report 19-40RR dated September 1986 reported to regulators that the toxic sludge had been transported to Waste Management's Emil facility. (Actually it was burned on site.) They reported that liquids from the pond were pumped to heating tanks and boiled off. Four tanks of 10,000 gallon capacity were used to boil PCP and creosote contaminated wastewater containing dioxin in order to remove organics (hazardous waste) without any effort to characterize the wastewater or to monitor the emissions. "During operation of the boiling-tanks, the potential exists for volatile organic emissions to the atmosphere." "Contaminated soil particles can be disbursed by wind ..."

HH.  On November 19, 1987, ADEM's Dan Cooper sent a Notice of Violation to LP's Roy Ezell following a compliance inspection of the Lockhart facility on September 22, 1987.

II.  December, 1987, groundwater quality assessment for LP prepared by ERM-Southeast states groundwater on-site was contaminated. No testing off-site. The entire thickness of the uppermost aquifer within boundaries of a five acre contamination flume impacted. Pentachlorophenol (contaminated with dioxin) was detected and it ranged from 120 to 13,000 ug/l. "The results of groundwater sampling ... confirm that hazardous waste constituents are present in the groundwater at the site." Contaminant ponds "... are probably the primary source of groundwater contaminate at the site."

John Berghoff, Jr., Esq.
Bernard Taylor, Esq.
October 19, 2005
Page 14

JJ.    On October 31, 1988, ADEM's Sue Robertson sent a Notice of Violation to LP's Roy Ezell following a compliance inspection of the Lockhart facility on August 2, 1988.

KK.    On December 27, 1990, ADEM's Steven Jenkins sent a Warning Letter to LP's Roy Ezell following a compliance inspection conducted by Todd Blake on December 19, 1990.

LL.    December 31, 1990, an ADEM memo stats that a distinct creosote odor along the creek down gradient from the closed impoundments was observed.

MM.    April, 1991, draft facility investigation report prepared for LP by ERM-Southeast, Inc. From 1962 to 1968 product was dissolved in a series of depressions along Pond Creek. Wood drying and treating was conducted in the same cylinder. These wastewater impoundments were the source of contamination. Contaminated by benezenes, 2,4-dimethyphenols, napthalene, styrene, toluene, xylene, pentachlorophenol, tetrachlorophenol and creosote. Pond Creek was also heavily contaminated. Freshly treated lumber was not stored in a "engineered area." The site grounds included many areas with dark colored ground staining. No air sampling was conducted.

NN.    April 4, 1991, LP contingency plan.  HS (high school) is approximately 2,000 yards southeast of the site.  (Map scale indicates that the high school was actually 2,000 feet or less, not yards.)

John Berghoff, Jr., Esq.
Bernard Taylor, Esq.
October 19, 2005
Page 15

OO.  On June 20, 1991, EPA region IV's James Scarbrough sent a Notice of Technical Inadequacy to James Boswell of LP following a review of the RCRA Facility Investigation Workplan dated April 21, 1991.

PP.  On March 11, 1992, ADEM's Steve Jenkins sent a Warning Letter to LP, Lockhart, following a Compliance Inspection on December 19, 1991.

QQ.  On April 22, 1993, ADEM's Steve Jenkins sent a Warning Letter to Roy Ezell of LP's Lockhart facility following a March 24, 1993, compliance inspection.  Violations noted: containers in hazardous waste satellite accumulation area were open and unmarked, notification of hazardous waste activity not updated.

RR.  On June 27, 1994, ADEM's Sue Robertson sent a Notice of Violation to Roy Ezell of LP's Lockhart facility following a June 2, 1994 compliance inspection.  Violations noted: drip pad was unbermed and had cracks.

SS.  ADEM site inspections September 22, 1994, by Arnold Mayberry indicates poor treatment practices resulting in significant impact of soil and water contamination.

TT.  January 6, 1995, ADEM memo from Chris Smith, field operations, suspected flooding in 1993 and 1994 had carried sediments and contaminants downstream.

UU.  August 9, 1995, letter to James Boxwell, L.P., by ADEM to plant manager: Why did you indicate or represent that only 2 boilers

John Berghoff, Jr., Esq.
Bernard Taylor, Esq.
October 19, 2005
Page 16

operated at once? Why did you state 150 when they are 250 H.P. boilers?.

VV.   July 11, 1997, LP continued to provide emissions estimates based on 150 H.P. boiler capacity when the boilers were, in truth, much larger.

WW.  September 3, 1997, ADEM inspection report: surface seeps of creosote and strong creosote odor in the flood plain of Pond Creek.

XX.   On November 19, 1997, Jeffrey Bilkert of ERM submitted an Interim Measures Work Plan to ADEM, on behalf of LP's Lockhart facility. The plan addressed metals concentrations in monitoring wells, evaluation of possible groundwater contamination and visible surface contamination.

YY.   On December 18, 1997, ADEM's Olivia Jenkins issued Consent Order No. 98-029-CHW to LP's Lockhart Sawmill, based on findings from a Compliance Inspection on July 2, 1997. Among other things Recovery Wells #1-6 had been shut down and recovery well #7 had been abandoned. The administrative penalty was $42,500.

ZZ.   On March 27, 1998, ADEM's Wm. Gerald Hardy sent a Notice of Deficiency to LP's Sherrie Brooks, following a review of the Interim Measures Workplan submitted on November 19, 1997. Areas addressed in the comments included the following: 1. Metals associated with suspended solids. 2. Evaluation of potential groundwater contamination west of Pond Creek. 3.

John Berghoff, Jr., Esq.
Bernard Taylor, Esq.
October 19, 2005
Page 17

Visible surface contamination.  4. Potential for ecological and human health concerns.  5. Interim Measures Workplan schedule.

AAA. LP Corp. June 2, 1998, capture zone analysis report.  Strong creosote odor and surface seeps in flood plain of Pond Creek. Expanding plume.  "Investigation should be modified from investigating potential contamination to investigating nature and extent ..."  Section 2.6, Air Permits, never allowed hazardous waste disposal by burning.  Filter waste and waste product was burned in facility boiler.

BBB. July 18, 2003, Neal Sherman, director of LP corporate real estate, addresses recent permit violations.

CCC. January 6, 2004, LP letter to ADEM regarding acceptance of financial responsibility and PACTIV's duty.

DDD. Report of March 23, 2004, from URS (LP contracted engineer) to ADEM, concerning installation of monitoring wells.  "Drilling encountered phased product, likely creosote, ... made the installation impossible."  (There was so much hazardous waste in the ground that they could not install a monitoring well.)

EEE. URS monitoring report of April 20, 2004 - Pentachlorophenol, which is added to preserve wood, can contain relatively high levels of dioxins and furans, including many highly toxic kinds. Dioxin and furan concentrations were found in tests of monitoring wells.

John Berghoff, Jr., Esq.
Bernard Taylor, Esq.
October 19, 2005
Page 18

FFF.  April 30, 2004, letter from PACTIV Dick St. James to ADEM re:
      newly discovered contamination.

GGG   URS engineering report of May 7, 2004 - discovery of free
      product (toxic waste) on March 21, 2004 was "unanticipated."

HHH   Letter of May 10, 2004, re: the closure plan is outside design
      limits now that additional contamination has been discovered.
      "Since discovery of the unanticipated NAPL and NAPL affected
      soils ..." This was an "unanticipated circumstance."

III.  May 24, 2004, letter to ADEM by URS, LP consultant, re: newly
      discovered contaminated soils.

JJJ.  URS report of June 10, 2004, "Two efforts were made to install
      a well at this location and in each case, drilling encountered
      phase product, likely creosote, which made the installation
      impossible."

KKK.  July 2, 2004, EPA notice of violation to LP.

LLL.  August 26, 2004, ADEM letter to LP director of real estate, Neal
      Sherman, deficiencies in latest report, copies to Dick J. St.
      James, PACTIV Corp., "a plume of wood treating related oils
      released from Pond 1 extends ... did not anticipate its
      existence."

MMM   October 29, 2004, groundwater watering report of LP Corp. One
      of the permit conditions included a requirement that two

John Berghoff, Jr., Esq.
Bernard Taylor, Esq.
October 19, 2005
Page 19

_____

monitoring wells be sampled for the presence of PCBs, dioxin and furans.  Both wells were abandoned by LP.

These statements are excerpts and summaries of the public record for the Lockhart/Florala Wood Treatment Facility.  The engineers were employed by Louisiana Pacific and PACTIV.  These records indicate that Louisiana Pacific, PACTIV/TMA and their predecessor were constant and habitual violators of state and federal regulations.  Although we may be able to prove – from your clients' own records released to public sources – that they regularly and consistently violated or ignored federal and state environmental laws and regulations, that proof is not necessary to establish liability.  Even when Louisiana Pacific and PACTIV/TMA were compliant with law, they still released toxic chemicals which migrated off site by air currents to cause the damages and injuries our clients have incurred.  Your clients' unintentional acts or omissions and daily operations caused or allowed toxic chemicals to be deposited upon our clients' homes, property and persons.

Although it is difficult to provide an exact date for each occurrence, both Louisiana Pacific and PACTIV/TMA were also plagued by a series of accidents.  Pipes left open by mistake, floods, fires and other accidents contributed to the accumulation of chemicals which caused our clients' damages and injuries.  We expect to prove that:

A.   There were occasional and random accidental discharges of toxic constituents into the air, soil or water.

B.   Both Louisiana Pacific and PACTIV/TMA were negligent in the hiring, selection, training and supervision of their employees.

John Berghoff, Jr., Esq.
Bernard Taylor, Esq.
October 19, 2005
Page 20

C.    Both Louisiana Pacific and PACTIV/TMA negligently failed to remediate or properly remediate contaminated property both on site and off site which resulted in further and additional exposure and harm to our clients.

D.    Both Louisiana Pacific and PACTIV/TMA negligently failed to warn purchasers of firewood, employees and nearby residents of the hazardous nature of the wood preservative chemicals used at the facility.

E.    Accidents and events that your clients may believe were unexpected could have been prevented if the facility had been operated safely and the employees adequately trained.

F.    In addition to the other methods of contact, these accidental discharges, and/or the failure to prevent or properly remediate accidental discharges, resulted in eventual exposure to children and persons living nearby who experienced personal injury, bodily injury, sickness, disease, death and property damage.

G.    Your clients failed or refused to recognize and clean up the contamination on the site which existed from years of accumulation and thus allowed the constituents to migrate off site. For example, chemical wastes were spread for dust control or used for "paving" on facility roadways.   Years of traffic allowed these chemicals to be blown away as toxic dust into our clients' residences.

H.    Louisiana Pacific and PACTIV/TMA's push for corporate profits without responsibility caused them to exceed production at the

John Berghoff, Jr., Esq.
Bernard Taylor, Esq.
October 19, 2005
Page 21

_____

Florala/Lockhart Wood Treatment Facility beyond its capacity
and ability to operate safely.

We would not attempt to prove our case based upon violations of federal
environmental laws in another state and we recognize that current
management is now different, but if Louisiana Pacific Corporation attempts
to argue that they were a good company and always obeyed the law, they
will open the door to proof that this company is a convicted felon.

A look at the list of diseases, birth defects and deaths experienced by
the members of this small community is telling.  These damages occurred
as the result of acts or omissions over a long period of time.  There is no
amount of money which will restore life to dead parents of young children,
change the debilitating effects of severe birth defects, or give quality of life
to our clients.  Our clients want to resolve these claims and get on with
their lives as best they can.  Our clients have agreed for us to make a lump
sum settlement offer to resolve all of their damage claims now.  Our clients
have also agreed to participate in a settlement for a definite sum for all of
them to be divided according to a formula which they will approve.  All of
our clients will provide a complete and full release of all liability, except
that settlements by children for more than $5,000.00, or those requested by
you, will be approved by court order.

Our clients who own residential property within one and one-half miles
of your clients' facility have also suffered diminution of their property value
and the additional expected cost of remediation.  If we can resolve the
property damage aspect of this case, we will provide your clients with an
executed release from all of the residential property owners within this area
that we represent.  Our offer of settlement includes an offer that we are
willing to structure a settlement for property damage that requires releases

John Berghoff, Jr., Esq.
Bernard Taylor, Esq.
October 19, 2005
Page 22

to be provided by owners of 80% of the residential property owners within this area.

We appreciate the fact that your clients have agreed to discuss settlement of the claims that we have described. We have attempted to provide you with as much information as we can practically provide under our tolling agreement in order to assist in your evaluation. We will continue to work with you and cooperate to gather additional information up to the beginning of our expected mediation date. We are mindful of the fact that your clients will always request more information, but we will do our best to accommodate you. We know that the out of pocket expense and litigation costs that we will incur, even if only representative cases are litigated, will exceed $10,000,000.00 for us. We project that the cost of defense for two defendants will even be higher. We prefer that this money be applied for settlement purposes. If we are unsuccessful at settlement and begin the litigation process, our offers to settle will expire. Once the money is spent and the time is wasted, it will cost substantially more to settle this case. If successful in settlement, we will not seek reimbursement of our fees and expenses incurred prior to mediation from your client. We have provided you with detailed client exposure information and you have had the ability to review tens of thousands of pages of representative medical records. We have provided you with confirmatory dioxin testing results, maps, photos, engineering reports and an opportunity to observe video interviews with your former management and employees. It is time to resolve this case or move it to another forum. We intend to do our best to work with you and your clients; but, if unsuccessful, our offer will expire on December 15, 2005, and suit will be filed on December 16, 2005.

The following is an approximate breakdown of our quantification of damages:

John Berghoff, Jr., Esq.
Bernard Taylor, Esq.
October 19, 2005
Page 23

_____

Property Damage (one mile radius)      $███████████

—  Personal Injury, Bodily Injury,     $███████████
   Sickness, Illness, Death (100
   representative claims)

                    TOTAL              $██████████

    Our clients have authorized us to enter into negotiations and attend
mediation to make a good faith effort to resolve their claims in order to
avoid the delay, trauma, and expense that litigation of these cases would
be expected to incur.  We will settle all of the claims of all of our clients for
$███████████  I hope that your clients will respond with a reasonable
solution and so that we can work together to help the people who have
meritorious and deserving claims.

                        Sincerely yours,

                        

                        W. Eason Mitchell

                        Wilbur O. Colom

                        Gregory A. Cade

WEM/knw
Enclosure
cc:   Honorable John Bickerman

# Medical Breakdown
## Florala/Lockhart

Total number of people in database: 1498

## Disease Categories:

| | |
|---|---|
| *Cancer* | 198 |
| *Genetic* | 176 |
| *Respiratory* | 395 |
| *Nephrology* | 127 |
| *Neurological* | 172 |
| *Immunological* | 23 |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## Pulmonary Conditions:

| | |
|---|---|
| *COPD* | 86 |
| *Bronchitis* | 149 |
| *Emphysema* | 19 |
| *Asthma* | 270 |
| *Sarcoidosis* | 12 |

## Neurological Conditions:

| | |
|---|---|
| *Mental Retardation* | 26 |
| *Down Syndrome* | 2 |
| *Parkinson's Disease* | 7 |
| *Mental Disorder* | 51 |

*(This includes depression, OCD, bi-polar, schizophrenia, etc.)*

| | |
|---|---|
| *Learning/Behavioral Disorder* | 36 |

*(ex. ADD, ADHD, etc.)*

| | |
|---|---|
| *Tourette's* | 2 |
| *Epilepsy* | 12 |
| *Multiple Sclerosis* | 2 |
| *'Cepha' Brain disorders* | 6 |

*(This includes Arnold Chiara Malformation, linked to hydrocephalus, hydrocephalus, anacephalie porencephalic cyst and microcephaly.)*

10/21/2005

**Immunological Conditions:**

| | |
|---|---|
| *Lupus* | 13 |
| *Scleroderma* | 1 |

**Serious Nephrological Problems:**

| | |
|---|---|
| *Kidney/Renal Failure* | 17 |
| *Kidney/Renal Insufficiency* | 6 |
| *Kidney/Renal Disease* | 40 |

**Genetic Problems:**

| | |
|---|---|
| *Scoliosis* | 22 |
| *Cerebral Palsy* | 10 |
| *Spina Bifida* | 4 |
| *Birth Defect(s)* | 121 |
| *Children born with Birth Defect(s)* | 33 |

**Female Reproductive Problems:**

| | |
|---|---|
| *Women having at least one miscarriage* | 44 |
| *Women under age 35 having a hysterectomy* | 23 |
| *Women age 35 to 40 having a hysterectomy* | 14 |
| *Total number of women having a hysterectomy* | 87 |

**Blood Disorders:**

| | |
|---|---|
| *Leukemia* | 2 |
| *Lymphoma* | 3 |
| (*1 is non-Hodgkins lymphoma*) | |
| *Lymph Node Cancer* | 2 |
| *Polycythemia* | 3 |
| *Pancytopenia* | 2 |
| *Thrombocytopenia* | 4 |
| *Leukopenia* | 7 |

10/21/2005

Cancers:

| | |
|---|---|
| *Breast Cancer* | 21 |
| *Lung Cancer* | 17 |
| *Brain Cancer* | 8 |
| (includes brain tumors, glyoblastoma,) | |
| *Cervical Cancer* | 15 |
| *Ovarian Cancer* | 4 |
| *Colon Cancer* | 7 |
| *Kidney Cancer* | 1 |
| *Skin Cancer* | 40 |
| (1 malignant melanoma) | |
| *Uterine Cancer* | 9 |
| *Prostate Cancer* | 19 |
| *Bone Cancer* | 3 |
| *Throat Cancer* | 3 |
| *Thyroid Cancer* | 2 |
| *Liver Cancer* | 5 |
| *Bladder Cancer* | 1 |
| *Multiple Myeloma* | 2 |
| *Chorio Carcinoma* | 1 |
| *Tumors – various locations* | 17 |
| (Excluding brain and fibroid tumors) | |
| *Testicular Cancer* | 1 |
| *Endometrial Cancer* | 1 |
| *Mucinous Cancer* | 1 |
| *Nasal Cancer* | 1 |
| *(Pyriform) Sinus Cancer* | 1 |
| *Adrenal Gland Cancer* | 1 |
| *Cancer* | 4 |
| (Unknown site or unknown origin) | |
| *Fibroid Tumors* | 51 |

10/21/2005